UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BRIAN WHITE,

                                    Plaintiff,

            -against-

WESTCHESTER COUNTY, *et al.*,

                                    Defendants.

No. 18-CV-730 (KMK)

<u>OPINION & ORDER</u>

<u>Appearances:</u>

Brian White
Malone, NY
*Pro Se Plaintiff*

Irma Wheatfield Cosgriff, Esq.
Westchester County Attorney's Office
White Plains, NY
*Counsel for Defendants*

Jonathan H. Bard, Esq.
Barclay Damon, LLP
Albany, NY
*Counsel for Defendants*

Paul Andrew Sanders, Esq.
Barclay Damon, LLP
Rochester, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

Plaintiff Brian White, currently incarcerated at Franklin Correctional Facility, brings this

pro se Action under 42 U.S.C. § 1983, alleging that Defendants violated his constitutional rights

by mismanaging his treatment for a hormone imbalance while incarcerated at Westchester

County Jail. He also asserts related state-law claims, including medical malpractice and

intentional infliction of emotional distress. Before the Court are two Motions To Dismiss, one

filed by Defendants Westchester County, Correction Officer Miller ("Miller"), and Law Librarian

Hewitt ("Hewitt," and collectively, "County Defendants") (Dkt. No. 45), and the other filed by

New York Correct Care Solutions, P.C. ("NYCCS"), Correct Care Solutions, LLC (together with

NYCCS, "Correct Care"), Dr. Alexis Gendell ("Dr. Gendell"), and Dr. Raul Ulloa ("Dr. Ulloa,"

and collectively, "Medical Defendants") (Dkt. No. 36).[1]  For the following reasons, County

Defendants' Motion is granted in part and denied in part, and Medical Defendants' Motion is

granted in full.

## I.  Background

### A.  Factual Background

The following facts are drawn from the Plaintiff's Complaint, (Compl. (Dkt. No. 2)), and

are taken as true for the purpose of resolving the instant Motions.

#### 1.  Medical Care Claims

Plaintiff alleges that he suffers from a chronic dysfunction of his pituitary gland, a

condition that Plaintiff's private physician had historically treated with medications that increase

Plaintiff's testosterone level and lower his estrogen level.  (Compl. 9 ¶¶ 20–22.)[2]  On October

---

[1] Plaintiff additionally named as Defendants Sgt. Matthew Kitt, Sgt. Randazzo, and Capt. Carden.  On February 5, 2018, the Court ordered Plaintiff to show cause as to why it should not dismiss all claims against those Defendants for failure to state a claim for relief.  (Dkt. No. 6.) Plaintiff did not respond.  On April 18, 2018, the Court dismissed without prejudice all claims as to those Defendants.  (Dkt. No. 15.)
    The Court also notes that Plaintiff names a "Kevin Cheverko" in the summary of Count II.  (*See* Compl. 19.)  However, Cheverko is neither named as a Defendant, (*see id.* at 1), nor listed as a party to this Action, (*see id.* at 2–3), and, as County Defendants state, "his name is not mentioned in the body of the Complaint except [in] para[graph] 85 and, . . . he has not been served in this action," (County Defs.' Mem. 1 n.5; *id.* at 5 n.9).  The Court thus declines to consider allegations against Cheverko.

[2] Plaintiff does not use consistent numbering in his Complaint.  To avoid confusion, the Court cites to the ECF-generated page number stamped in the upper right-hand corner of Plaintiff's Complaint, followed where applicable by the paragraph number.

26, 2017, Plaintiff entered Westchester County Jail ("WCJ") as a pretrial detainee. (*Id.* at 9 ¶ 19.)[3] Plaintiff informed the examining nurse at intake that he suffered from a chronic pituitary condition that required specific medication. (*Id.*) Medical staff confirmed Plaintiff's condition and "assured" Plaintiff "that his medications would be validated by his community physician by October 30, 2017 and subsequently administered." (*Id.* at 10 ¶ 23). Plaintiff asserts, however, that even though his medications were "verified" by his pharmacy, (*id.* at 10 ¶ 24), and "validated by his community physician," (*id.* at 11 ¶ 29), he did not receive his medications for over a month, causing him to suffer a severe hormone imbalance and, as a result, fatigue, muscle and joint pain, weight change, numbness, and dizziness, (*id.* at 10–13 ¶¶ 26–31, 37–38). During the time that Plaintiff did not receive his medications, he made numerous sick call requests for his medications and for pain relief, (*id.* at 10–11 ¶ 28), "personally approached a nurse administering med[ications] . . . request[ing] to be provided with" his medications, (*id.*), and wrote letters to Dr. Ulloa (the medical director at WCJ) and Dr. Gendell (the director of chronic care at WCJ) that went unanswered, (*id.* at 12 ¶ 32).

On November 6, 2017, "a nurse from [Correct Care] took Plaintiff for blood work to screen his testosterone[] and [e]strogen levels." (*Id.* at 11 ¶ 29.) Following his blood test, Plaintiff "filed numerous request[s]" to Correct Care "inquiring about the laboratory results," and was thereafter informed that "his levels were dangerously low." (*Id.* at 11 ¶ 30.)[4] On November

---

[3] Plaintiff asserts that WCJ contracts with Correct Care to provide medical care to inmates, (Compl. 5, 8), and that Correct Care's employees are "all trained[] . . . including [as to] the proper technique for administering intramuscular injections," (*id.* at 12 ¶ 36).

[4] Plaintiff states that the "normal range for a male 34-years old is anywhere from 500–1000 [t]estosterone," and that Plaintiff's private physician "wanted [his] testosterone level to be at a balanced 800." (Compl. 13 ¶ 38.) However, Plaintiff's test results showed a level of "[t]estosterone 391 (a drop from 1040 to 391 in just 1.5 weeks)." (*Id.* at 11 ¶ 30.)

13, 2017, a nurse from Correct Care "performed another blood test upon Plaintiff, and discovered thereafter[] that Plaintiff's testosterone dropped again to an alarming [level]." (*Id.* at 11 ¶ 31.)[5]

Plaintiff alleges that he "received his first dose of [medication]" on November 28, 2017, "34 days after arriving at WCJ." (*Id.* at 12 ¶ 35.) Plaintiff asserts that the delay caused him to have "serious side effects," including "vomiting, numbness, [and] headaches," and "expos[ing] him to a potential tumor in his pituitary gland." (*Id.* at 19–20 ¶¶ 59–63.) Plaintiff also asserts that, when he did receive his medications, the nurses failed to aspirate the needle prior to performing his injections, (*id.* at 16 ¶ 46), and then "perform[ed] the injection[] at an extremely slow pace with the intention[] of causing Plaintiff pain," (*id.* at 16 ¶ 45).

Sometime in December 2017, Plaintiff filed a grievance relating to his medical care. On December 24, 2017, Plaintiff received a response denying his grievance. (*Id.* at 27.) The response stated in relevant part:

> I received written documentation from Michael Kelly, Director of Nursing[,] which states that on 11/20/17, the on-site Medical Director, Dr. Ulloa[,] spoke with your community physician regarding your plan of care. The community physician reported to Dr. Ulloa that he wanted to discontinue medication for you. Per Dr. Ulloa your plan of care here at [WCJ] includes a referral to the endocrinologist and an appointment has been scheduled. Medication and specifically the dosage per Dr. Ulloa will be titrated (gradually decreased to completion) based on lab values. As far as the nursing staff administering intramuscular injections per Michael Kelly, each nurse is trained and has passed a national licensing examination. Included in their years of formal training is the proper technique for administering intramuscular injections . . . . Your complaint regarding the administering of your injection is vague. You do not provide any specific details about the injection; you only state the nurse did not know how to administer an intramuscular shot.

(*Id.*) Plaintiff's appeal of his grievance was denied on December 28, 2017. (*Id.* at 28.) The denial stated in relevant part:

---

[5] In particular, the November 13, 2017 test showed Plaintiff's "[f]ree testosterone [level to be] 25, [blood] testosterone . . . 46, and . . . estrogen [level to be] . . . under 25." (Compl. 11 ¶ 31.)

> Our healthcare provider [Correct Care] is well aware of your condition and is diagnosing and [has] been treating you in accordance with standard medical practice. . . . [E]ach of their nurses [is] required to pass a national licensing examination and are routinely assessed for competency. [Correct Care] has also[,] as you request . . . [,] scheduled you for an appointment with an [e]ndocrinologist.

(*Id.*)

On December 27, 2017, Plaintiff was taken to Westchester County Medical Center, where he was evaluated by an endocrinologist as part of the plan of care recommended by Dr. Ulloa. (*Id.* at 13 ¶ 39.) The endocrinologist "opted to continue Plaintiff's medication in spite of [Dr. Ulloa's] urgency to titrate Plaintiff off his medications." (*Id.* at 13 ¶¶ 39–40.) The endocrinologist also "demanded that [Correct Care] refer Plaintiff immediately for an MRI" to check for a potential pituitary gland tumor. (*Id.* at 13–14 ¶ 41.) As of the time of the filing of the Complaint, Plaintiff had not received an MRI. (*Id.*)[6]

Plaintiff asserts that Medical Defendants' conduct was consistent with Westchester County and Correct Care's policies of denying medication, delaying administration of medication, administering smaller doses than recommended by private physicians, failing to employ an endocrinologist or consult with a private endocrinologist, failing to train and supervise its employees, and failing to investigate claims of medical malpractice, all in a deliberate effort to decrease Westchester County's costs and increase Correct Care's profits. (*Id.* at 12 ¶¶ 33–34; *id.* at 21–22 ¶¶ 70–71, 76.) He further asserts that dozens of lawsuits have been filed against Correct Care, Westchester County, and their employees, including Dr. Ulloa and Dr. Gendell, alleging similar conduct at WCJ and other facilities. (*Id.* at 5–8; *id.* at 18–19 ¶¶ 52–57.)

---

[6] It is not clear from the Parties' filings whether Plaintiff has since received an MRI. Nor is it known whether Plaintiff has developed a pituitary gland tumor.

## 2. Claim of Harassment and Threats

On December 20, 2017, Plaintiff went to WCJ's law library to prepare a "notice of claim" against Correct Care with regard to his medical care claims. (Compl. 14 ¶ 42.)[7] Plaintiff alleges that, after he prepared his notice of claim, he went to Defendant Hewitt, the law librarian, to have it notarized. (*Id.*) Defendant Hewitt then "read the contents" of the notice of claim out loud in front of other prison officials, including Defendant Miller, a corrections officer, and unnamed Correct Care nurses. (*Id.*) In so doing, Hewitt intentionally announced — inaccurately — that Plaintiff was receiving treatment for HIV. (*Id.*) Plaintiff asserts that Hewitt and Miller thereafter harassed Plaintiff about his alleged HIV status and encouraged other prison officials and inmates to harass Plaintiff for same. (*Id.* at 14, 16 ¶¶ 43–45; *id.* at 20–21 ¶¶ 65, 67.) When Plaintiff told Hewitt that he would file a grievance against Hewitt if she did not stop, she allegedly threatened that she would get other inmates — associates of her child's father — to assault him if he did so. (*Id.* at 14, 16 ¶¶ 44; *id.* at 20–21 ¶ 66.) Plaintiff thus did not file a grievance against Hewitt "out of fear of being assaulted." (*Id.* at 14, 16 ¶ 44.) Plaintiff alleges that, as a result of Hewitt and Miller's comments, "a vast majority of inmates and WCJ staff believe that Plaintiff has H.I.V. and treat him indifferent" and "[p]eople are afraid to shower after Plaintiff, use the microwave after him, use the phone after him, and inmates never pick him on a sports team or to play board games." (*Id.* at 21 ¶ 67.)

---

[7] In general, as a condition precedent to bringing a state-law claim against a New York municipality, a plaintiff must file a notice of claim within 90 days after the claim arises that describes, among other things, the nature of the claim. *See* N.Y. Gen. Mun. Law §§ 50-e(1)(a), 50-e(2); *Russell v. Westchester Comm. Coll.*, No. 16-CV-1712, 2017 WL 4326545, at *5–8 (S.D.N.Y. Sept. 27, 2017) (describing notice of claim requirements).

B.  Procedural Background

Plaintiff filed the Complaint and request to proceed without prepayment of fees, that is, in forma pauperis ("IFP"), on January 24, 2018.  (Dkt. Nos. 1, 2.)  The Court granted Plaintiff's IFP request on January 29, 2018.  (Dkt. No. 4.)  On February 5, 2018, the Court issued an Order directing Plaintiff to show cause as to why it should not dismiss claims against Defendants Sgt. Matthew Kitt, Sgt. Randazzo, and Capt. Carden, for failure to state a claim for relief, and additionally directed service on the remaining Defendants.  (Dkt. No. 6.)  Plaintiff did not respond, and the Court thereafter dismissed without prejudice all claims as to those Defendants. (Dkt. No. 15.)  The remaining Defendants were served.  (Dkt. Nos. 9, 18–22, 40–41.)

On February 2, 2018, Plaintiff filed a letter stating that he has "continued to have issues receiving [his] medications and receiving proper care," that the "pain [and] my side effects have become worse," and that he has "developed [g]ynecomastia," which he alleges will require surgery.  (Dkt. No. 10.)  The letter additionally stated that the County canceled his scheduled "50-h hearing" regarding his claims.  (*Id.*)[8]  The Court ordered Defendants to respond on April 9, 2018.  (Dkt. No. 12.)  On April 24, 2018, Defendants acknowledged the 50-h hearing was adjourned and stated that it was rescheduled for April 26, 2018.  (Dkt. No. 16.)  Defendants additionally requested further time to respond to Plaintiff's substantive claims regarding his medical condition in order to obtain his consent to share his medical records.  (*Id.*)  The Court granted Defendants until May 24, 2018 to file a response.  (Dkt. No. 17.)  Defendants did not file a response; it is unclear whether Defendants obtained Plaintiff's consent.

---

[8] New York Law provides: "Whenever a notice of claim is filed against a city . . . the city . . . shall have the right to demand an examination of the claimant relative to the occurrence and extent of the injuries or damages for which claim is made."  N.Y. Gen. Mun. Law § 50-h.

On May 7, 2018 and May 14, 2018, Defendants filed letters seeking a pre-motion conference in anticipation of filing motions to dismiss. (Dkt. Nos. 23, 24.) On May 15, 2018, the Court set a briefing schedule. (Dkt. Nos. 26, 27.) Medical Defendants filed their Motion To Dismiss and accompanying papers on June 21, 2018. (Not. of Mot. (Dkt. No. 36); Decl. in Supp. of Mot. (Dkt. No. 37); Mem. of Law in Supp. of Mot. ("Med. Defs.' Mem.") (Dkt. No. 38).) County Defendants filed their Motion To Dismiss and accompanying papers on July 17, 2018. (Not. of Mot. (Dkt. No. 45); Decl. in Supp. of Mot. (Dkt. No. 46); Mem. of Law in Supp. of Mot. ("County Defs.' Mem.") (Dkt. No. 47).) On August 23, 2018, Plaintiff filed a letter, (Dkt. No. 51), which the Court construed as Plaintiff's opposition to the Motions, (Dkt. No. 52). On September 7, 2018, Defendants filed their replies to Plaintiff's opposition. (Dkt. Nos. 56, 57.)

On May 31, 2018, Plaintiff filed a letter alleging that, when he was transported to a new facility, his records were transferred with the exception of "information pertaining to . . . [his] hormone condition." (Dkt. No. 29.) Plaintiff then filed an additional letter on July 10, 2018, alleging that "[t]his is a direct and intentional retaliative blow to my health and wellbeing." (Dkt. No. 43.) Plaintiff further alleged that "[i]t is now six weeks without my medication and I have growing side effects as well as mental and bodily harm." (*Id.*) On July 13, 2018, the Court filed a memo endorsement stating that Defendants are "reminded of [their] obligation to preserve evidence for discovery and is ordered to respond to Plaintiff's allegation." (Dkt. No. 44.) Defendants have not responded.

## II. Discussion

### A. Standard of Review

Defendants move to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (*See* County Defs.' Mem. 1; Med. Defs.' Mem. 1.) The Supreme Court has held that

although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations, alteration, and internal quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement."  *Id.* (alteration and internal quotation marks omitted).  Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff need allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'show[n]' — 'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam). Further, "[f]or the purpose of resolving [a] motion to dismiss, the Court . . . draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citation omitted).

Where, as here, a plaintiff proceeds pro se, the Court must "construe[] [his complaint] liberally and interpret[] [it] to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (per curiam) (internal quotation marks omitted). However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedural and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (internal quotation marks omitted); *see also Caidor v. Onondaga County*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (italics and internal quotation marks omitted)).

B.  Analysis

County and Medical Defendants each argue the Complaint must be dismissed for failure to exhaust, (County Defs.' Mem. 14–15; Med. Defs.' Mem. 24–25), and that Plaintiff fails to state a *Monell* claim against the County or Correct Care, or their employees acting in their official capacities, (County Defs.' Mem 18–21; Med. Defs.' Mem. 8–12). County Defendants further argue that Plaintiff fails to allege a cognizable constitutional violation by Hewitt or Miller, (County Defs.' Mem. 15–17), and that Hewitt and Miller are protected by qualified immunity, (*id.* at 21). Medical Defendants further argue that Plaintiff fails to allege the personal involvement of Dr. Ulloa and Dr. Gendell in the alleged constitutional violation, (Med. Defs.'

Mem. 5–7); that Plaintiff fails to allege a cognizable constitutional violation because he does not allege deliberate indifference to a serious medical need, (*id.* at 12–19); and that Plaintiff fails to allege any state law claim, (*id.* at 19–22).

## 1. Exhaustion

### a. Applicable Law

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under [§] 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This "language is 'mandatory': An inmate 'shall' bring 'no action' (or said more conversationally, may not bring any action) absent exhaustion of available administrative remedies." *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016) (quoting *Woodford v. Ngo*, 548 U.S. 81, 85 (2006)). The exhaustion requirement applies to "all inmate suits about prison life," *Porter v. Nussle*, 534 U.S. 516, 532 (2002), and includes actions for monetary damages even if monetary damages are not available as an administrative remedy, *see Booth v. Churner*, 532 U.S. 731, 741 (2001). Moreover, the PLRA "requires proper exhaustion, which means using all steps that the prison grievance system holds out." *Williams v. Priatno*, 829 F.3d 118, 122 (2d Cir. 2016) (alterations, citations, and internal quotation marks omitted). Indeed, the PLRA demands "strict compliance with the grievance procedure . . . , or else dismissal must follow inexorably." *McCoy v. Goord*, 255 F. Supp. 2d 233, 246 (S.D.N.Y. 2003) (alteration, citations, and internal quotation marks omitted); *see also Porter*, 534 U.S. at 520. Exhaustion must occur *prior* to Plaintiff's filing suit; "[s]ubsequent exhaustion after suit is filed therefore is insufficient." *Neal v. Goord*, 267 F.3d 116, 123 (2d Cir. 2001), *overruled on other grounds by Porter*, 534 U.S. at 532; *see also Lopez v. Cipolini*, 136 F. Supp. 3d 570, 582 (S.D.N.Y. 2015) (noting that

"subsequent exhaustion after suit is filed is insufficient, even where, as here, it might seem more efficient simply to proceed with the lawsuit rather than dismiss it only to see it immediately re-filed" (alteration, citations, and internal quotation marks omitted)).

However, the PLRA contains a "textual exception to mandatory exhaustion." *Ross*, 136 S. Ct. at 1858. "[T]he exhaustion requirement hinges on the 'availab[ility]' of administrative remedies: An inmate . . . must exhaust available remedies, but need not exhaust unavailable ones." *Id.* (second alteration in original). Available "grievance procedures . . . are [those] capable of use to obtain some relief for the action complained of." *Id.* at 1859 (internal quotation marks omitted). In *Ross*, the Supreme Court identified "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Id.* An administrative remedy is unavailable: (1) where "it operates as a simple dead end — with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) where the procedure is "so opaque that it becomes, practically speaking, incapable of use" such that "no ordinary prisoner can discern or navigate it"; or (3) where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859–60. It bears noting, however, that the "three circumstances discussed in *Ross* do not appear to be exhaustive," *Williams*, 829 F.3d at 123–24 & n.2, but rather "guide the Court's inquiry," *Khudan v. Lee*, No. 12-CV-8147, 2016 WL 4735364, at *5 (S.D.N.Y. Sept. 8, 2016).

Finally, failure to exhaust is an affirmative defense, not a pleading requirement. *See Jones v. Bock*, 549 U.S. 199, 216 (2007); *Grullon v. City of New Haven*, 720 F.3d 133, 141 (2d Cir. 2013). As such, Defendants bear the burden of proving failure to exhaust, *see McCoy*, 255 F. Supp. 2d at 248 ("[The] defendants bear the burden of proof and prisoner plaintiffs need not

plead exhaustion with particularity."), and "inmates are not required to specially plead or demonstrate exhaustion in their complaints," *Jones*, 549 U.S. at 216. Therefore, "dismissal is appropriate on a motion to dismiss where failure to exhaust is clear on the face of the complaint." *Brinson v. Kirby Forensic Psych. Ctr.*, No. 16-CV-1625, 2018 WL 4680021, at *6 (S.D.N.Y. Sept. 28, 2018); *see also McCoy*, 255 F. Supp. 2d at 249 ("If failure to exhaust is apparent from the face of the complaint, however, a Rule 12(b)(6) motion is the proper vehicle.").

### b. Applicable Grievance Program

As Medical Defendants note, (*see* Med. Defs.' Mem. 25), the grievance program applicable here is the New York State Department of Corrections and Community Supervision's Inmate Grievance Program ("IGP"). *See* 7 N.Y.C.R.R. § 701 *et seq.* The IGP provides for a three-step grievance process. *See Colon v. Annucci*, No. 17-CV-4445, 2018 WL 4757972, at *17 (S.D.N.Y. Sept. 28, 2018); *Terry v. Hulse*, No. 16-CV-252, 2018 WL 4682784, at *6 (S.D.N.Y. Sept. 28, 2018); *Hydara v. Burger*, No. 14-CV-1415, 2018 WL 1578390, at *5 (S.D.N.Y. Mar. 29, 2018). At the first step, an inmate submits a written grievance to the Inmate Grievance Review Committee ("IGRC"), which attempts to resolve the issue "informally," and if there is no resolution, "conduct[s] a hearing to answer the grievance or make a recommendation to the superintendent." 7 N.Y.C.R.R. § 701.5(b). If the IGRC's determination is adverse to the inmate, at the second step the inmate may appeal to the superintendent. *See id.* § 701.5(c). And if the superintendent's determination is adverse to the inmate, at the third and final step the inmate may appeal to the Central Office Review Committee ("CORC"). *See id.* § 701.5(d). "[O]nly after CORC has reviewed the appeal and rendered a decision are New York's grievance procedures exhausted." *Gardner v. Daddezio*, No. 07-CV-7201, 2008 WL 4826025, at *2 (S.D.N.Y. Nov. 5,

2008).  That is, only after completing all three steps of the IGP may an inmate initiate suit, *see*

*Ross*, 136 S. Ct. at 1856; *Williams*, 829 F.3d at 122, provided no exception to exhaustion applies.

<u>c.  Application to Defendant Hewitt</u>

It is undisputed that Plaintiff did not file a grievance against Defendant Hewitt.  The

Complaint states that Plaintiff "did not grieve [D]efendant Hewitt" regarding her alleged

harassment of Plaintiff regarding his HIV status "out of fear of being assaulted by her children's

father['s] counter-parts," who were also inmates at WCJ.  (Compl. 14, 16 ¶ 44.)  County

Defendants argue that no exception to exhaustion excuses Plaintiff's failure to exhaust, because

Plaintiff only alleges a "second-hand threat" designed to "circumvent the established grievance

procedure," which, they contend, "cannot form the basis of one of the three *Ross* exceptions."

(County Defs.' Mem. 14.)

County Defendants' argument is unpersuasive.  As noted, an administrative remedy is

unavailable where "prison administrators thwart inmates from taking advantage of a grievance

process through machination, misrepresentation, or intimidation," *Ross*, 136 S. Ct. at 1860,

including where "officials misled or *threatened* individual inmates so as to prevent their use of

otherwise proper procedures," *id.* (emphasis added).

Here, Plaintiff alleges:

> Plaintiff confronted [D]efendant Hewitt about her actions . . . and requested that
> she refrain from reading/misstating the contents of his legal work out-loud in the
> future because her actions were subjecting him to retaliation.  Plaintiff advised
> [D]efendant Hewitt[] that if her conduct persisted in the future, that he would file a
> grievance.  Defendant Hewitt then stated to Plaintiff[,] "My baby['s] father's boys
> are here in the jail!  I'm from Mount Vernon, if you don't know you better ask
> about [J]ermaine, so file your grievance if you want and see what happens to your
> white ass."  Plaintiff understood this to mean that he would be assaulted by other
> inmates if he filed a grievance against [D]efendant Hewitt.

(Compl. 14, 16 ¶ 44.) Contrary to County Defendants' contention that "Plaintiff has not identified one single act that prevented him from filing a grievance against Hewitt," (County Defs.' Mem. 15), this allegation constitutes a specific and clear threat that relates directly to Plaintiff's prospective grievance against Hewitt. Not only did Hewitt threaten harm to Plaintiff, but did so with particularity, by identifying the people who would harm Plaintiff, and did so in direct reply to Plaintiff's telling Hewitt that he would file a grievance against her. This is sufficient to plausibly fit within one of the *Ross* exceptions. *Cf. Jackson v. Downstate Corr. Facility*, No. 16-CV-267, 2018 WL 3650136, at *6 (S.D.N.Y. July 31, 2018) (rejecting argument that a threat prevented the plaintiff from filing a grievance as "wholly unsupported by any evidence and [as] conclusory insofar as [the] [p]laintiff point[ed] to no facts regarding such intimidation"); *Medina v. Kaplan*, No. 16-CV-7223, 2018 WL 797330, at *5 (S.D.N.Y. Feb. 8, 2018) ("Conclusory allegations of intimidation are insufficient to establish the unavailability of administrative remedies. . . . There is no allegation that the threat was even related to her grievance and ability to exhaust available administrative relief.").

County Defendants respond that, after Hewitt's alleged threat, Plaintiff filed a notice of claim "assert[ing] medical claims against [Correct Care] and various correction officers" and "started the grievance process . . . about the injections he was receiving." (County Defs.' Mem. 15.) In Defendants' view, this sequence of events shows that Hewitt's alleged threat cannot have intimidated Plaintiff, for if Plaintiff "was not intimidated to file a [notice of claim] or a lawsuit, there is no reason why he could not have filed a timely grievance" against Hewitt. (*Id.* (relying on *Riles v. Buchanan*, 656 F. App'x 577, 581 (2d Cir. 2016)).) This argument misses the mark. That Plaintiff later filed a grievance about *other* allegations against *other* prison officials says nothing about his fear of retaliation by Defendant Hewitt were he to file a grievance with his

15

allegations against her. The Second Circuit's unpublished decision in *Riles*, far from supporting County Defendants' argument, is to the contrary. There, an inmate failed to complete the relevant grievance process before filing suit in part because a prison official "threatened to punish him if he 'pushed the issue.'" *Riles*, 656 F. App'x at 581. The Second Circuit concluded the alleged threat did not excuse the inmate's failure to exhaust because he thereafter submitted a grievance "in spite of this alleged threat." *Id.* As the Court put it, the inmate "was not deterred from exhausting; he simply did not exhaust in accordance with the procedures." *Id.* Here, however, Plaintiff was clearly deterred from exhausting *as to Defendant Hewitt*.

Therefore, County Defendants fail to carry their burden of proving failure to exhaust with respect to Plaintiff's claims against Defendant Hewitt. *See McCoy*, 255 F. Supp. 2d at 248 ("[T]his circuit[] ha[s] held that nonexhaustion is an affirmative defense, and that therefore defendants bear the burden of proof . . . .").

### d. Application to Defendant Miller

County Defendants argue that Plaintiff "fail[ed] to file a grievance regarding the alleged statements attributed to Miller." (County Defs.' Mem. 14.) To be sure, unlike the case with Defendant Hewitt, the Complaint is silent as to whether Plaintiff filed (or attempted to file or otherwise indicated he would file) a grievance against Defendant Miller. Plaintiff does not allege that Miller threatened Plaintiff, or indeed that Plaintiff had any contact with Miller following Miller's alleged harassing comments. (*See* Compl. 14, 16 ¶¶ 44–46.) Nor does the Complaint allege that *Hewitt*'s threat deterred him from filing a grievance against *Miller*. (*Id.*)

Yet, it is County Defendants' burden to prove Plaintiff's failure to exhaust. *See McCoy*, 255 F. Supp. 2d at 248 ("[The] defendants bear the burden of proof and prisoner plaintiffs need not plead exhaustion with particularity."). Because "inmates are not required to specially plead

or demonstrate exhaustion in their complaints," *Williams*, 829 F.3d at 122 (internal quotation marks omitted), Plaintiff's failure to include information in his Complaint showing the steps he took to exhaust with respect to Defendant Miller does not demonstrate his failure to exhaust. Here, County Defendants offer no evidence showing that Plaintiff in fact failed to exercise the grievance process with respect to Defendant Miller.

Therefore, it is not clear from the face of the Complaint that Plaintiff failed to exhaust his administrative remedies as to his claims against Defendant Miller. *See Simmons v. Cripps*, No. 12-CV-1061, 2013 WL 1285417, at *3 (S.D.N.Y. Mar. 28, 2013) ("Where, as here, there is ambiguity in the record as to the circumstances surrounding failure to exhaust, the Court agrees that it would be more prudent to rule on the exhaustion issue on a more fully-developed record."). Accordingly, the Court declines to dismiss the Complaint on these grounds.[9] County Defendants remain free to raise the exhaustion issue in the future. *Id.*

### e. Application to Medical Defendants

Medical Defendants — Correct Care, Dr. Gendell, and Dr. Ulloa — argue that, although "Plaintiff acknowledges the existence of WCJ's grievance procedure," he "only exercised the first two steps of the grievance process" and failed to "appeal[] to the third and final level in this process." (Med. Defs.' Mem. 25 (citing in particular Compl. 27–28).)

---

[9] Because County Defendants "ha[ve] not submitted any additional evidence" on the issue of exhaustion, it would be inappropriate "to convert [County Defendants'] instant Motion to a Rule 56 motion for summary judgment on the issue of exhaustion." *Martinez v. Aycock-West*, 164 F. Supp. 3d 502, 510 n.7 (S.D.N.Y. 2016) (citing *Hilbert v. Fischer*, No. 12-CV-3843, 2013 WL 4774731, at *3 (S.D.N.Y. Sept. 5, 2013)); *see also McCoy*, 255 F. Supp. 2d at 251 ("If nonexhaustion is not clear from the face of the complaint, a defendant's motion to dismiss should be converted, pursuant to Rule 12(b), to one for summary judgment limited to the narrow issue of exhaustion and the relatively straightforward questions about the plaintiff's efforts to exhaust, whether remedies were available, or whether exhaustion might be, in very limited circumstances, excused.").

Medical Defendants fail to sustain their burden of proving Plaintiff's failure to exhaust. *See McCoy*, 255 F. Supp. 2d at 248. To be sure, although the Complaint shows that Plaintiff exercised the first two steps in the grievance process, (*see* Compl. 27–28), there is no documentation attached to the Complaint showing that Plaintiff exercised the final step in the grievance process, that is, appeal to the CORC, *see* 7 N.Y.C.R.R. § 701.5(d). This omission, however, is not enough to demonstrate failure to exhaust. Again, "inmates are not required to specially plead or demonstrate exhaustion in their complaints." *Williams*, 829 F.3d at 122 (internal quotation marks omitted). Where, as here, "a prisoner indicates that he has taken *some* steps toward exhaustion, district courts will not normally infer from his silence as to any remaining steps that he has not fully exhausted." *Groenow v. Williams*, No. 13-CV-3961, 2014 WL 941276, at *2 (S.D.N.Y. Mar. 11, 2014) (emphasis in original). Medical Defendants offer no evidence showing that Plaintiff in fact failed to exercise the final step in the grievance process. Nor is this a case where the "timing of the [c]omplaint . . . shows that the grievance process could not have been completed when Plaintiff commenced this action," *Perez v. City of New York*, No. 14-CV-7502, 2015 WL 3652511, at *3 (S.D.N.Y. June 11, 2015), for the Complaint was submitted on January 26, 2018, (*see* Compl. 26), nearly a month after the Plaintiff's second-step grievance appeal was denied, (*see id.* at 28).

Therefore, it is not clear from the face of the Complaint that Plaintiff failed to exhaust his administrative remedies as to his claims against Medical Defendants. Accordingly, the Court declines to dismiss the Complaint on these grounds. *See Sanders v. City of New York*, No. 16-CV-7426, 2018 WL 3117508, at *5 (S.D.N.Y. June 25, 2018) (declining to dismiss complaint where the plaintiff "filed an initial grievance" and "forwarded his grievance to [the] [w]arden" but "[did] not address whether [the] [p]laintiff requested a hearing before the IGRC or appealed

to the CORC"); *Martinez*, 164 F. Supp. 3d at 509–10 ("Although [the] [p]laintiff does not

specifically state that he complied with each level of the appeals process, or that he filed a

grievance, interpreting his allegations liberally, his efforts are sufficient such that nonexhaustion

is not clear from the face of the Complaint."); *James v. Orange County Corr. Facility*, No. 09-

CV-9226, 2011 WL 5834855, at *3 (S.D.N.Y. Nov. 18, 2011) (denying motion to dismiss for

failure to exhaust where the plaintiff supplied a "partial history of his exhaustion of the grievance

process").[10]  Medical Defendants remain free to raise the exhaustion issue in the future.  *See*

*Simmons*, 2013 WL 1285417, at *3.

### 2. *Monell* Liability

#### a.  Applicable Law

"Congress did not intend municipalities to be held liable [under § 1983] unless action

pursuant to official municipal policy of some nature caused a constitutional tort."  *Monell v.*

*Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).  Thus, "to prevail on a claim against a

municipality under [§] 1983 based on acts of a public official, a plaintiff is required to prove:

(1) actions taken under color of law; (2) deprivation of a constitutional or statutory right;

(3) causation; (4) damages; and (5) that an official policy of the municipality caused the

constitutional injury."  *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008).  The fifth

element reflects the notion that a *Monell* defendant "may not be held liable under § 1983 solely

because it employs a tortfeasor."  *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 403 (1997);

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986) (holding that a municipality may not be

---

[10] As with County Defendants, *see supra* n.9, because Medical Defendants "ha[ve] not
submitted any additional evidence" on the issue of exhaustion, it would be inappropriate "to
convert [Medical Defendants'] instant Motion to a Rule 56 motion for summary judgment on the
issue of exhaustion."  *Martinez*, 164 F. Supp. 3d at 510 n.7 (citation omitted).

liable under § 1983 "by application of the doctrine of respondeat superior" (italics omitted)).

Rather, "municipalities may only be held liable when the municipality itself deprives an

individual of a constitutional right." *Newton v. City of New York*, 566 F. Supp. 2d 256, 270

(S.D.N.Y. 2008)

A plaintiff may satisfy the "policy, custom[,] or practice" requirement by alleging one of

the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by
> government officials responsible for establishing the municipal policies that caused
> the particular deprivation in question; (3) a practice so consistent and widespread
> that, although not expressly authorized, constitutes a custom or usage of which a
> supervising policy-maker must have been aware; or (4) a failure by policymakers
> to provide adequate training or supervision to subordinates to such an extent that it
> amounts to deliberate indifference to the rights of those who come into contact with
> the municipal employees.

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citations omitted);

*see also Patterson v. County of Oneida*, 375 F.3d 206, 226–27 (2d Cir. 2004) (describing

methods of establishing *Monell* liability).

b. Application

Plaintiff makes several allegations that go toward *Monell* liability. He alleges that

Defendant Westchester County exhibited "deliberate indifference" to Plaintiff's medical care

through its "failure to train[] and supervise contractors," including Defendant Correct Care.

(Compl. 19 ¶ 56.) Plaintiff also alleges that Westchester County and Correct Care, despite

having the "responsibility to provide inmates [at] WCJ . . . with medical" treatment, (*id.* at 5),

fail "to timely prescribe" essential medications to inmates, thereby "needlessly" placing inmates

"at risk of death or serious physical injury" and demonstrating "deliberate indifference to WCJ's

inmate population," (*id.* at 6; *id.* 18 ¶ 53). Plaintiff next alleges that Correct Care has a "pattern[]

and practice" of exhibiting "unreasonable delay in ordering essential medications," (*id.* at 6), and

fails "to ensure that all essential medications are ordered and stocked prior to" the refill date, thereby causing inmates to go "several days without . . . required medication," (*id.* at 7). Further, Plaintiff alleges that Correct Care "serves inmates their medications at fluctuating times" including up to three hours after the "ordered issue time[]." (*Id.* at 8.) Finally, Plaintiff seems to allege that Westchester County is on notice of various medical care issues by virtue of having been named in dozens of federal and state lawsuits. (*Id.* at 5, 8; *id.* 18 ¶ 54.)

Plaintiff's allegations cannot be read to assert the "formal policy" or "official actions" theories of *Monell* liability. *Brandon*, 705 F. Supp. 2d at 276–77. The Court thus considers whether Plaintiff plausibly states a "custom" or "failure to train" theory of liability. *Id.*

<u>i. Widespread and Persistent Custom</u>

A plaintiff may satisfy the "policy, custom, or practice" requirement by alleging "a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware." *Brandon*, 705 F. Supp. 2d at 276–77. "[A]n act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law," *Brown*, 520 U.S. at 404, which is to say, that it is a "longstanding practice or custom which constitutes the standard operating procedure of the local government entity," *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (internal quotation marks omitted); *see also Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996) (noting that a municipality's custom "need not be memorialized in a specific rule or regulation"). To prevail on this theory of municipal liability, a plaintiff must prove that the custom at issue is permanent and well-settled. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) ("[T]he Court has long recognized that a plaintiff may be able to prove

the existence of a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a 'custom or usage' with the force of law." (internal quotation marks and citation omitted)); *Davis v. City of New York*, 228 F. Supp. 2d 327, 346 (S.D.N.Y. 2002), *aff'd*, 75 F. App'x 827 (2d Cir. 2003) (explaining that "[w]idespread means that [the unconstitutional acts in question] are common or prevalent throughout the [government body]; well-settled means that the [unconstitutional acts in question] have achieved permanent, or close to permanent, status"). Normally, "a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the municipality." *Tieman v. City of Newburgh*, No. 13-CV-4178, 2015 WL 1379652, at *12 (S.D.N.Y. Mar. 26, 2015) (alteration and internal quotation marks omitted). As the Supreme Court emphasized in *Monell*, Congress enacted § 1983 "because of the persistent and widespread discriminatory practices of state officials," and out of recognition that municipalities' practices could become "so permanent and well settled as to constitute a 'custom or usage' with the force of law." 436 U.S. at 691 (citation and internal quotation marks omitted).

Here, Plaintiff's allegations are insufficient to allege a widespread or permanent practice. Plaintiff alleges that Westchester County and Correct Care, through their employees acting in their official capacities, fail "to timely prescribe" essential medications to inmates, exhibit "unreasonable delay in ordering essential medications," fail "to ensure that all essential medications are ordered and stocked prior to the [refill date]," and "serve[] inmates their medications at fluctuating times." (Compl. 6–8; *id.* 18 ¶ 53.) However, Plaintiff does not specify — or indeed identify — *any* incidents of delay, failure to order, failure to restock, or fluctuating administration with respect to *other* inmates, which is fatal to his *Monell* claim. *See Walker v. City of New York*, 63 F. Supp. 3d 301, 312 (E.D.N.Y. 2014) ("[The] [p]laintiffs have not

identified any additional, similar examples of unconstitutional practices beyond the events they complain of here.").

Instead, Plaintiff cites to other federal and state lawsuits against Westchester County.  (*Id.* at 5, 8; *id.* 18–19 ¶¶ 54–55.)  However, "'a plaintiff's citation to a few lawsuits involving claims of alleged [constitutional violations] is not probative of the existence of an underlying policy by a municipality.'"  *Harris v. City of Newburgh*, No. 16-CV-2731, 2017 WL 4334141, at *5 (S.D.N.Y. Sept. 27, 2017) (alteration in original) (quoting *Ameduri v. Village of Frankfort*, 10 F. Supp. 3d 320, 341 (N.D.N.Y. 2014)); *see also Jean-Laurent v. Wilkerson*, 461 F. App'x 18, 22–23 (2d Cir. Feb. 8, 2012)  ("[The plaintiff's] citation to various lawsuits involving inmate claims for the excessive use of force is not probative of the existence of an underlying policy that could be relevant here."); *Nardoni v. City of New York*, 331 F. Supp. 3d 116, 128 (S.D.N.Y. 2018) ("Because neither of the[] [cited other] cases resulted in an admission or finding of liability, those cases . . . . are insufficient to establish [the] [p]laintiff's *Monell* claim."); *Peterec v. Hilliard*, No. 12-CV-3944, 2013 WL 5178328, at *11–12 (S.D.N.Y. Sept.16, 2013) (a single similar lawsuit is insufficient to give rise to a *Monell* claim).  Further, even if citing to other cases was probative of a *Monell* policy, Plaintiff does not explain at all how the specific claims made in those lawsuits relate to claims made in his own suit or why the cases are otherwise comparable.[11]  Plaintiff therefore fails to allege a widespread and pervasive practice.

---

[11] Indeed, three of the five cases Plaintiff cites, (*see* Compl. 18–19 ¶ 55), are unhelpful to his claim because the court in each held that the plaintiffs had *failed* to establish *Monell* liability on any theory.  *See Rodriguez v. County of Westchester*, No. 15-CV-9626, 2017 WL 118027, at *7 (S.D.N.Y. Jan. 11, 2017); *Melvin v. County of Westchester*, No. 14-CV-2995, 2016 WL 1254394, at *12–13 (S.D.N.Y. Mar. 29, 2016); *Dilworth v. Goldberg*, 914 F. Supp. 2d 433, 453–55 (S.D.N.Y. 2012).
The other two cases Plaintiff cites, (*see* Compl. 18–19 ¶ 55), are distinguishable.  In *Bektic-Marrero v. Goldberg*, 850 F. Supp. 2d 418 (S.D.N.Y. 2012), the Court held that the plaintiff had established *Monell* liability on a custom-or-practice theory because, *inter alia*,

<u>ii.  Failure to Train</u>

A plaintiff may also satisfy the "policy, custom, or practice" requirement by alleging "a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees." *Brandon*, 705 F. Supp. 2d at 276–77.  However, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).  Only where a plaintiff can demonstrate that a municipality's failure to train "amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact" will a municipal policy actionable under § 1983 be established.  *Moray v. City of Yonkers*, 924 F. Supp. 8, 12 (S.D.N.Y. 1996) (internal quotation marks omitted); *see also Connick*, 563 U.S. at 61 (same).  "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Brown*, 520 U.S. at 410.  To establish deliberate indifference, a plaintiff must demonstrate (1) that "a policymaker knows to a moral certainty that her employees will confront a given situation"; (2) that "the situation either presents the employee with a difficult choice of the sort that training . . . will make less difficult or that there is a history of employees mishandling the situation"; and (3) that "the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992) (internal quotation marks omitted); *see*

Plaintiff identified a November 2009 U.S. Department of Justice report that "concluded that the Westchester DOC's provision of medical care to inmates was constitutionally deficient in several respects." *Id.* at 431.  Similarly, in *Alvarado v. Westchester County*, 22 F. Supp. 3d 208 (S.D.N.Y. 2014), the Court held that plaintiffs established *Monell* liability by looking in part to the same DOJ report.  *Id.* at 217–18.  Here, however, Plaintiff does not argue that that nine-year-old report applies to his case, nor does he identify any other report or other document that does apply.

*also Case v. City of New York*, 233 F. Supp. 3d 372, 404 (S.D.N.Y. 2017) ("At the motion to dismiss stage, the Second Circuit uses a three-prong test to determine whether a plaintiff has demonstrated a municipality's 'deliberate indifference' in the context of a failure to train claim." (citing *Walker*, 974 F.2d at 297–98)). "[D]emonstration of deliberate indifference requires a showing that the official made a conscious choice, and was not merely negligent," *Jones v. Town of East Haven*, 691 F.3d 72, 81 (2d Cir. 2012), and generally requires a showing of "[a] pattern of similar constitutional violations by untrained employees," *Connick*, 563 U.S. at 62 (internal quotation marks omitted). At the same time, however, the Supreme Court in *Connick* reaffirmed the viability, in limited circumstances, of the "single-incident" theory of liability. *See id.* at 63– 65. Under the single-incident theory, a municipality can be found to be deliberately indifferent based on a single constitutional violation where "the unconstitutional consequences of failing to train [are] so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Id.* at 64. A violation of constitutional rights must be a "highly predictable consequence" of the failure to train. *Id.* at 63–64 (internal quotation marks omitted). "Thus, deliberate indifference may be inferred where the need for more or better supervision to protect against constitutional violations was obvious, but the policymaker failed to make meaningful efforts to address the risk of harm to plaintiffs." *Cash v. County of Erie*, 654 F.3d 324, 334 (2d Cir. 2011) (alteration, citations, and internal quotation marks omitted).

In sum, "while it may be true that § 1983 plaintiffs cannot be expected to know the details of a municipality's training programs prior to discovery, this does not relieve them of their obligation under *Iqbal* to plead a facially plausible claim." *Stoeckley v. County of Nassau*, No. 15-CV-514, 2015 WL 8484431, at *2 (E.D.N.Y. Dec. 9, 2015) (alterations omitted). "To state a claim for municipal liability based on failure to train, [a] [p]laintiff . . . must allege facts that

support an inference that the municipality failed to train its [employees], that it did so with deliberate indifference, and that the failure to train caused his constitutional injuries." *Tieman*, 2015 WL 1379652, at *22.

Here, Plaintiff alleges that Westchester County, acting via its medical-care contractor Correct Care, failed to train prison officials at WCJ in the proper medical care of inmates with pituitary gland disorders. (Compl. 5, 8; *id.* 19 ¶ 56.) However, Plaintiff does not point to the existence of any formal or informal training program.[12] Nor does Plaintiff explain with any specificity how the training provided to prison medical staff was deficient. The "mere allegation[] of . . . inadequate training . . . [is] insufficient . . . unless supported by factual details." *Tieman*, 2015 WL 1379652, at *13; *see also Simms v. City of New York*, No. 10-CV-3420, 2011 WL 4543051, at *2 n.3 (E.D.N.Y. Sept. 28, 2011) (noting that plaintiffs must "provide more than a simple recitation of their theory of liability, even if that theory is based on a failure to train"), *aff'd*, 480 F. App'x 627 (2d Cir. 2012). Plaintiff's conclusory allegations are thus insufficient. *See Santos v. New York City*, 847 F. Supp. 2d 573, 577 (S.D.N.Y. 2012) ("Because the existence of a municipal policy or practice, such as a failure to train or supervise, cannot be grounded solely on the conclusory assertions of the plaintiff, [the plaintiff's] claims against the [c]ity are dismissed with prejudice." (citation omitted)); *Johnson v. City of New York*,

---

[12] Had Plaintiff identified such a training program, he would have been required to "identify a specific deficiency in the . . . training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation." *Wray v. City of New York*, 490 F.3d 189, 196 (2d Cir. 2007) (internal quotation marks and citation omitted); *see also Okin v. Vill. Of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 440–41 (2d Cir. 2009) ("The plaintiff must offer evidence to support the conclusion that the training program was inadequate, not that a particular officer may be unsatisfactorily trained or that an otherwise sound program has occasionally been negligently administered, and that a hypothetically well-trained officer would have avoided the constitutional violation." (internal alterations, citation, and quotation marks omitted)).

No. 06-CV-9426, 2011 WL 666161, at *4 (S.D.N.Y. Feb. 15, 2011) (finding the plaintiff's "unsupported conclusory allegation that the [c]ity failed to train the individual [d]efendants" insufficient to establish municipality liability); *Bradley v. City of New York*, No. 08-CV-l106, 2009 WL 1703237, at *3 (E.D.N.Y. June 18, 2009) ("The [c]omplaint's conclusory, boilerplate language — that the [c]ity failed to adequately train, discipline, and supervise employees and failed to promulgate and put into effect appropriate rules and regulations applicable to the duties and behavior of its employees — is insufficient to raise an inference of the existence of a custom or policy, let alone that such a policy caused [the] [p]laintiff to be arrested without probable cause." (internal alterations, quotation marks, and citation omitted)); *McAllister v. N.Y.C. Police Dep't*, 49 F. Supp. 2d 688, 705 (S.D.N.Y. 1999) ("Conclusory allegations of a municipality's pattern or policy of unconstitutional behavior are insufficient to establish a *Monell* claim, absent evidence to support such an allegation.").

In sum, the Complaint lacks sufficiently specific allegations from which the Court could reasonably infer either that Westchester County or Correct Care had a widespread or pervasive custom of delaying administration of hormone or other medication to inmates, or that Westchester County or Correct Care failed to train its employees regarding the proper administration of hormone or other medication to inmates. Because Plaintiff has not plausibly alleged "that an official policy of the municipality caused the constitutional injury," *Roe*, 542 F.3d at 36, the *Monell* claim against Westchester County, Correct Care, and the individual Defendants in their official capacities must be dismissed.

27

### 3. Personal Involvement of Individual Medical Defendants

Medical Defendants argue that the Complaint must be dismissed as to Dr. Ulloa and Dr. Gendell for failure to allege their personal involvement in the alleged constitutional violation. (Med. Defs.' Mem. 5.)

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation." *Grullon*, 720 F.3d at 138. To establish personal involvement, a plaintiff must show that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* at 139 (italics and internal quotation marks omitted). In other words, "[b]ecause vicarious liability is inapplicable to . . . [Section] 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. Therefore, Plaintiff must plausibly allege that the individual Medical Defendants' actions fall into one of the five categories identified above. *See Lebron v. Mrzyglod*, No. 14-CV-10290, 2017 WL 365493, at *4 (S.D.N.Y. Jan. 24, 2017) (holding that the five categories "still control[] with respect to claims that do not require a showing of discriminatory intent" post-*Iqbal*).

As described above, the central allegations in the Complaint are the month-long delay in the administration of Plaintiff's medications, (Compl. 1 ¶ 1; *id.* at 10–13 ¶¶ 26–29, 32, 35, 41; *id. at* 19–20 ¶¶ 59–60), and the improper administration of his injection, including the failure to

aspirate the needle prior to injection and the slow pace of performing the injection, (*id.* at 16 ¶¶ 45–46).  The Complaint does not allege that Dr. Ulloa and Dr. Gendell themselves delayed the administration of Plaintiff's medications or "participated directly" in the administration of his injections.  *Grullon*, 720 F.3d at 139.  Rather, the Complaint alleges only that Dr. Ulloa and Dr. Gendell did not respond to letters from Plaintiff "informing [them] that [Correct Care's] failure to provide him with his medications ha[d] caused him to suffer."  (Compl. 12 ¶ 32.)  To the extent this allegation offers a "failure to remedy" or "deliberate indifference" theory of personal involvement, *see Grullon*, 720 F.3d at 139, Plaintiff fails to explain when he wrote Dr. Ulloa and Dr. Gendell, what exactly he stated in his letters to them that would alert them to the occurrence of a constitutional violation, or for how long after the letters were sent he lacked his medications or received delayed or otherwise inadequate administration of his injection.  In other words, the Complaint does not establish a plausible connection between Dr. Ulloa's and Dr. Gendell's alleged failures to respond and the alleged constitutional harm.  *See Thompson v. Booth*, No. 16-CV-3477, 2018 WL 4760663, at *7 (S.D.N.Y. Sept. 28, 2018) (holding no personal involvement where "[t]here is no allegation that [a defendant] failed to act on information regarding the [allegedly] unlawful conduct or otherwise acted with gross negligence" (third alteration in original) (internal quotation marks and citation omitted)).  This threadbare allegation therefore fails to offer sufficient factual detail to establish personal involvement.

The Complaint also alleges that Dr. Ulloa and Dr. Gendell "have both been the subject of various federal lawsuits that include wrongful death claims at [Westchester County Jail]." (Compl. 8.)  This conclusory allegation, however, is insufficient, as Plaintiff does not cite to those other lawsuits or explain how those suits relate to Plaintiff's case.  The Complaint also alleges that Dr. Ulloa and Dr. Gendell are expected "to keep medical cost[s] at WCJ to a

minimum by way of refusing inmates basic treatments." (*Id* 12 ¶ 33.) This allegation too is conclusory and, moreover, does not bear on Dr. Ulloa and Dr. Gendell's personal involvement in Plaintiff's case.

Finally, Plaintiff alleges that Dr. Ulloa and Dr. Gendell lacked "training with regard to Plaintiff's [p]ituitary [g]land" condition. (*Id.* 13 ¶ 41.) Yet, Plaintiff fails to connect this statement to the alleged constitutional violations. As noted, the Complaint does not allege that Dr. Ulloa and Dr. Gendell were themselves responsible either for the delay in Plaintiff's receiving his medications or in the improper administration of Plaintiff's injections; it only alleges that they failed to respond to his letters. It is not clear from the Complaint how Dr. Ulloa and Dr. Gendell's alleged lack of training in pituitary gland conditions connects to their failure to respond or otherwise establishes their personal involvement.

These are the only allegations in the Complaint that are specific to Dr. Gendell. All other relevant allegations involve an unnamed intake nurse, (*id.* 9–10 ¶¶ 19, 23), an unnamed nurse who fielded Plaintiff's request for sick call, (*id.* 10–11 ¶ 28), and two unnamed nurses who did Plaintiff's blood work, (*id.* 11 ¶¶ 29, 31), none of whom is named as a defendant in this case. Therefore, the Complaint fails to allege Dr. Gendell's personal involvement. Because, the Complaint is devoid of sufficient factual allegations to allow the Court to "draw the reasonable inference that" Gendell is "liable for the misconduct alleged," *Iqbal*, 556 U.S. at 678–79, the Complaint must be dismissed as to Dr. Gendell.

Plaintiff makes one final allegation specific to Dr. Ulloa. The Complaint alleges that Dr. Ulloa wanted to titrate Plaintiff's hormone medications. (Compl. 13 ¶¶ 39–40.) This allegation is supported by documentation attached to the Complaint, namely, a grievance letter sent by a prison official to Plaintiff on December 24, 2017, which states in relevant part:

> [O]n 11/20/2017 . . . , Dr. Ulloa spoke with [Plaintiff's] community physician regarding [Plaintiff's] plan of care.  The community physician reported to Dr. Ulloa that he wanted to discontinue medication for [Plaintiff].  Per Dr. Ulloa [Plaintiff's] plan of care here at [WCJ] includes a referral to the endocrinologist and an appointment has been scheduled .  Medication and specifically the dosage per Dr. Ulloa will be titrated (gradually decreased to completion) based on lab values.

(*Id.* at 27.)  However, Plaintiff fails to connect Dr. Ulloa's titration plan to the alleged constitutional violations: there is no suggestion that titration caused or otherwise contributed to either the delay in the receipt of Plaintiff's medications between October and November 2017 or the improper administration of the injections.  Indeed, the grievance letter states, without contradiction elsewhere in the Complaint, that it was Plaintiff's private physician, *not* Dr. Ulloa, who "wanted to discontinue medication."  (*Id.*)  Nor is there a suggestion that the titration plan led other prison medical officials to delay or improperly administer the medication.  Finally, there is no suggestion that the titration plan demonstrates that Dr. Ulloa acted with "deliberate indifference" to Plaintiff's medical needs, *see Grullon*, 720 F.3d at 139, for the grievance letter — which is uncontradicted elsewhere in the Complaint — indicates that Dr. Ulloa both acted in concert with Plaintiff's private physician, (Compl. 27), and referred Plaintiff to an endocrinologist, who examined Plaintiff and "opted to continue Plaintiff's medication in spite of [Dr.] Ulloa's urgency to titrate Plaintiff off his medications," (*id.* at 13 ¶¶ 39–40).

Therefore, the Complaint fails to allege Dr. Ulloa's personal involvement in the alleged constitutional violations.  Because, the Complaint is devoid of sufficient factual allegations to allow the Court to "draw the reasonable inference that" Dr. Ulloa is "liable for the misconduct alleged," *Iqbal*, 556 U.S. at 678–79, the Complaint must be dismissed as to Dr. Ulloa.

### 4.  Retaliation Claim Against Defendant Hewitt and Defendant Miller

Plaintiff's third cause of action alleges harassment and retaliation against, among others, Defendants Hewitt and Miller.  (*See* Compl. 20.)[13]

"Prisoners have a constitutional right to petition the government, and it is a violation of § 1983 for prison officials to retaliate against prisoners for the exercise of that right."  *Bartley v. Collins*, No. 95-CV-10161, 2006 WL 1289256, at *4 (S.D.N.Y. May 10, 2006).  However, "[c]ourts properly approach prisoner claims of retaliation with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official . . . can be characterized as a constitutionally proscribed retaliatory act."  *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (internal quotation marks and citation omitted); *see also Bartley*, 2006 WL 1289256, at *4 (noting that retaliation claims "are easily fabricated and may cause unwarranted judicial interference with prison administration").  Therefore, "to survive a motion to dismiss . . . , a plaintiff asserting [a] First Amendment retaliation claim[] must allege (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action."  *Davis*, 320 F.3d at 352 (internal quotation marks and citation omitted).  An adverse action is any "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights."  *Id.* at 353 (citation omitted).  In determining whether a prison official's conduct constitutes adverse action, "the court's inquiry must be tailored to the

---

[13] Because the Court concludes that Plaintiff fails to establish *Monell* liability with respect to Westchester County or Correct Care or its employees acting in their official capacities, *see supra* Section II.B.2, and that Plaintiff failed to establish the personal involvement of the individual Medical Defendants, *see supra* Section II.B.3, the Court need only consider at this time whether Plaintiff states a claim against Defendants Hewitt and Miller in their individual capacities.

different circumstances in which retaliation claims arise, bearing in mind that prisoners may be required to tolerate more . . . than average citizens." *Id.* (internal quotation marks, alterations, and citation omitted).

### a. Defendant Hewitt

The Complaint alleges that Hewitt, in notarizing Plaintiff's notice of claim against Medical Defendants, read aloud the contents of the notice of claim in front of others, contrary to her normal practice, (Compl. 14 ¶ 42; *id.* at 20–21 ¶¶ 65–66); that in so doing Hewitt deliberately misstated that Plaintiff was receiving treatment for HIV, causing others to harass Plaintiff about his alleged HIV status, (*id.* at 14, 16 ¶¶ 42–45; *id.* at 20–21 ¶¶ 65, 67); and that Hewitt — in response to Plaintiff's telling Hewitt that he would file a grievance against her if she did not stop — stated, "[m]y baby['s] father's boys are here in the jail; I'm from Mount Vernon, if you don't know you better ask about [J]ermaine, so file your grievance if you want and see what happens to your white ass," (*id.* 14, 16 ¶ 44). In other words, the Complaint alleges that Hewitt threatened Plaintiff that associates of her child's father, also incarcerated at WCJ, would harm him were he to file a grievance against Hewitt, thereby deterring Plaintiff from filing grievance against Hewitt "out of fear of being assaulted." (*Id.*)

As to the first *Davis* requirement, County Defendants argue that "although a grievance can be considered protected speech, Plaintiff admittedly did not file one," and that "[i]f the instant lawsuit is considered protected speech, any action that predates that speech cannot form the basis of a retaliation claim." (County Defs.' Mem. 16 (internal quotation marks and citation omitted).) This argument is doubly flawed. First, County Defendants miss that Plaintiff engaged in protected speech by filing his notice of claim against Medical Defendants. (Compl. 14 ¶ 42.) *See Barnett v. City of Yonkers*, No. 15-CV-4013, 2018 WL 4680026, at *9 (S.D.N.Y. Sept. 28,

2018) (holding that the plaintiff "engaged in protected speech by filing the notice of claim");

*M.C. v. County of Westchester*, No. 16-CV-3013, 2018 WL 1275435, at *8–9 (S.D.N.Y. Mar. 6,

2018) ("[T]here is no doubt that [the] [p]laintiff has a protected interest in commencing a suit

against public officials to protect his constitutional rights.").  Second, County Defendants take an

overly narrow view of when an action relating to filing a grievance becomes protected speech.

Of course, "[i]t is well-established that inmates' filing of grievances is a constitutionally

protected exercise of their right under the First Amendment to petition the government for the

redress of grievances."  *Mateo v. Bristow*, No. 12-CV-5052, 2013 WL 3863865, at *4 (S.D.N.Y.

July 16, 2013) (citations omitted).  While courts have not drawn a bright line at the moment of

filing, they have held that a prisoner's oral complaint may constitute protected speech.  *See, e.g.*,

*Quezada v. Roy*, No. 14-CV-4056, 2017 WL 6887793, at *11 (S.D.N.Y. Dec. 14, 2017)

("[P]rotected activity is not limited to the filing of grievances, and there is some evidence that

[the] [p]laintiff complained to [one defendant] about [another defendant's] harassing conduct,

which is its own exercise of protected activity.")*; McIntosh v. United States*, No. 14-CV-7889,

2016 WL 1274585, at *26 (S.D.N.Y. Mar. 31, 2016) (collecting cases "for the proposition that

verbal complaints can be protected action for purposes of a First Amendment retaliation claim");

*Smith v. Woods*, No. 03-CV-480, 2006 WL 1133247, at *10 (N.D.N.Y. Apr. 24, 2006) ("[T]he

First Amendment protects, not only the filing of written grievances and complaints, but, under

some circumstances, the making of oral complaints to corrections officers."), *aff'd*, 219 F. App'x

110 (2d Cir. 2007); *Gill v. Riddick*, No. 03-CV-1456, 2005 WL 755745, at *10 (N.D.N.Y. Mar.

31, 2005) (collecting cases); *but see Garrido v. Coughlin*, 716 F. Supp. 98, 101 (S.D.N.Y. 1989) (holding that "verbal confrontation" is not protected activity).[14]

Here, Plaintiff's clear, specific statement to Hewitt — that he would file a grievance against Hewitt if she did not stop harassing him — is protected speech. *See Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015) ("[I]t is well established that retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983." (internal quotation marks and citation omitted)); *Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir. 1988) (noting that the "intentional obstruction of a prisoner's right to seek redress of grievances is precisely the sort of oppression that section 1983 is intended to remedy." (alterations and internal quotation marks omitted)). Therefore, taking Plaintiff's allegations as true, Plaintiff has plausibly alleged that he was engaging in protected speech both when he approached Hewitt to notarize his notice of claim against Medical Defendants and when he confronted Hewitt about her harassment of him.

As to the second *Davis* requirement, Plaintiff has sufficiently demonstrated adverse action. To be sure, Hewitt's harassing comments — her reading aloud of Plaintiff's notice of claim in front of others and her deliberately misstating Plaintiff's HIV status — do not constitute adverse action because they did not "deter" Plaintiff either from filing his notice of claim against Medical Defendants or confronting Hewitt with a prospective grievance against her. *Davis*, 320 F.3d at 352 (internal quotation marks omitted). The Complaint reflects that, following the

---

[14] Courts have also held that other conduct related to the filing of the grievance may be protected. *See, e.g.*, *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996) (holding that the plaintiff's "filing of a grievance and attempt to find inmates to represent the grievants . . . is constitutionally protected").

harassing comments, Plaintiff did file his notice of claim and did confront Hewitt. Therefore, although Hewitt's alleged comments were unprofessional, and caused Plaintiff to suffer legitimate embarrassment and even humiliation, they amount to "'insulting or disrespectful comments' . . . [that] 'without more' are 'simply *de minimis*' acts that fall 'outside the ambit of constitutional protection.'" *Toliver v. City of New York*, 530 F. App'x 90, 92 (2d Cir. 2013) (quoting *Davis*, 320 F.3d at 353).

Hewitt's alleged threat of physical harm, however, is another story. "Courts have found that, while verbal threats may qualify as adverse actions, they must be 'sufficiently specific and direct' to be actionable." *Terry*, 2018 WL 4682784, at *11 (quoting *Mateo*, 2013 WL 3863865, at *5); *see also Albritton v. Morris*, No. 13-CV-3708, 2018 WL 1609526, at *18 (S.D.N.Y. Mar. 29, 2018) (same). "The less direct and specific a threat, the less likely it will deter an inmate from exercising his First Amendment rights." *Mateo*, 682 F. Supp. 2d at 434; *see also Hofelich v. Ercole*, No. 06-CV-13697, 2010 WL 1459740, at *2 (S.D.N.Y. Apr. 10, 2010) (concluding that "whether [verbal threats] constitute adverse action seems to depend on their specificity and the context in which they are uttered"); *Lunney v. Brureton*, No. 04-CV-2438, 2007 WL 1544629, at *23 (S.D.N.Y. May 29, 2007) (collecting cases and noting that "verbal threats may constitute adverse action . . . depend[ing] on their specificity and the context in which they are uttered").[15]

---

[15] The Court notes that some cases have held that verbal threats are not, absent physical injury, actionable. *See, e.g.*, *Bradshaw v. City of New York*, No. 15-CV-4638, 2018 WL 818316, at *8 (S.D.N.Y. Feb. 9, 2018) ("[T]he law is clear that although indefensible and unprofessional, verbal threats or abuse are not sufficient to state a constitutional violation cognizable under Section 1983." (ultimately quoting *Harris v. Lord*, 957 F. Supp. 471, 475 (S.D.N.Y. 1997)); *see also Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986) (affirming dismissal of "claim[] that prison guards called [the plaintiff] names" because the claim "did not allege any appreciable injury"); *Holland v. City of New York*, 197 F. Supp. 3d 529, 546 (S.D.N.Y. 2016) (collecting cases and holding that "[a]llegations of threats or verbal harassment, without any injury or damage, do not state a claim under [Section] 1983" (ultimately citing *Purcell*, 790 F.2d at 265)); *Rembert v. Cheverko*, No. 12-CV-9196, 2014 WL 3384629, at *9 (S.D.N.Y. July 10, 2014)

Here, Plaintiff alleges a specific threat. The Complaint states:

> Plaintiff confronted [D]efendant Hewitt about her actions . . . and requested that she refrain from reading/misstating the contents of his legal work out-loud in the future because her actions were subjecting him to retaliation. Plaintiff advised [D]efendant Hewitt[] that if her conduct persisted in the future, that he would file a grievance. Defendant Hewitt then stated to Plaintiff[,] "My baby father's boys are here in the jail! I'm from Mount Vernon, if you don't know you better ask about [J]ermaine, so file your grievance if you want and see what happens to your white ass." Plaintiff understood this to mean that he would be assaulted by other inmates if he filed a grievance against [D]efendant Hewitt.

(Compl. 14 ¶ 44.) This allegation constitutes a specific, clear threat made in response to Plaintiff's prospective grievance against Defendant Hewitt. Hewitt threatened physical harm to Plaintiff, and did so with particularity, by pointing to the inmates who would harm Plaintiff and explaining why they would harm him at her direction. And Hewitt allegedly did so in direct response to Plaintiff's statement that he would file a grievance against her. The Court thus concludes that Plaintiff has plausibly alleged that Hewitt's specific and direct verbal threat was intended to "deter" Plaintiff from exercising his First Amendment rights and therefore constitutes adverse action for purposes of a retaliation claim.[16] *Cf. Terry*, 2018 WL 4682784, at *11

---

(holding allegation that officers "intimidated [the plaintiff]" after the plaintiff filed a grievance to be "insufficient to allege adverse action").

However, as one court has noted, "the Second Circuit has not definitively spoken" on the question whether a threat may give rise to a retaliation claim. *Vincent v. Sitnewski*, 117 F. Supp. 3d 329, 340 (S.D.N.Y. 2015). Indeed, a close reading of *Purcell* — the Second Circuit case generally cited for the proposition that physical injury must be shown, *see, e.g., Holland*, 197 F. Supp. 3d at 546 — shows that it did not involve *threats* to an inmate but "claims that prison guards called [the plaintiff] names and denied him pens." *Purcell*, 790 F.2d at 265. Perhaps as a result of this confusion, "courts in this District are split" on the question whether physical injury must be shown, *Vincent*, 117 F. Supp. 3d at 340, as the cases cited in the text demonstrate.

[16] County Defendants argue that "[w]hile [Plaintiff] claims to have perceived a threat, Plaintiff did not think twice about asking Hewitt to notarize his [notice of claim], which she did." (County Defs.' Mem. 18 (citation omitted).) This argument reverses the series of events as stated in the Complaint. Plaintiff alleges that he received notary services from Hewitt on or about December 20, 2017. (Compl. 14 ¶ 42.) Hewitt thereafter allegedly harassed Plaintiff, (*id.*), causing Plaintiff to "confront[] [D]efendant Hewitt . . . in or around December 26, 2017," (*id.* at 14 ¶ 44). It was during that confrontation that Hewitt allegedly threatened Plaintiff. (*Id.*)

(holding officers' verbal threats did not constitute adverse action because the plaintiff did "not know the names of the officers who threatened him" and because the threats "lack[ed] . . . specificity and directness" (citations omitted)); *Albritton*, 2016 WL 1267799, at *18 (holding statement that officer "told [the] [p]laintiff that grievances were unlikely to succeed and said that he would handle things 'his way'" was insufficiently specific or direct).

Finally, as to the third *Davis* factor, the Court concludes that Plaintiff has alleged sufficient facts to plausibly establish a causal connection between the protected speech and the adverse action. "A plaintiff may establish causation either directly through a showing of retaliatory animus, or indirectly through a showing that the protected activity was followed closely by the adverse action." *Smith v. County of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015). Here, when Plaintiff notarized his notice of claim (the first instance of protected speech), Hewitt allegedly made the harassing comments regarding Plaintiff's medical status, prompting Plaintiff to confront Hewitt and threaten a grievance against her (the second instance of protected speech). Hewitt's threat was made immediately after, and in direct response to, the second instance of protected speech. Retaliatory animus is thus properly inferred from this sequence of events.

Therefore, the Court concludes that Plaintiff states a retaliation claim against Defendant Hewitt sufficient to survive a motion to dismiss. County Defendants' undeveloped contention that "to allow this case to proceed to discovery on these facts would open the floodgates to inmates to claim retaliation for every decision they dislike" is not well-taken. (County Defs.' Mem. 17 (internal quotation marks and citation omitted).) County Defendants do not cite to anything suggesting that threats like those alleged in the Complaint are commonplace. The Court thus rejects the notion that allowing limited discovery in such circumstances is unwarranted.

### b.  Claim Against Defendant Miller

The Complaint alleges that Defendant Miller was present in the law library when Defendant Hewitt made her harassing comments — that is, when she read aloud the contents of Plaintiff's notice of claim and misstated his HIV status.  (Compl. 14 ¶ 42.)  The Complaint also alleges that, following this, Miller harassed Plaintiff about his HIV status and encouraged other prison officials and inmates to harass Plaintiff, (*id.* at 14, 16 ¶¶ 43–45; *id.* at 20–21 ¶¶ 65, 67), causing "a vast majority of inmates and WCJ staff [to] believe that Plaintiff has H.I.V. and treat him indifferent," and to be "afraid to shower after Plaintiff, use the microwave after him, use the phone after him, and . . . pick him on a sports team or to play board games." (*id.* at 21 ¶ 67.)

As to the first *Davis* factor, the act of filing the notice of claims was itself protected speech.  *See supra* Section II.B.4.a.  However, as to the second *Davis* factor, Plaintiff fails to allege that Miller took any adverse action against him.  Unlike the case with Defendant Hewitt, there is no allegation in the Complaint that Miller threatened Plaintiff in any way.  Nor is there an allegation that Plaintiff engaged with Defendant Miller when notarizing his notice of claim against Medical Defendants, or that Plaintiff confronted Miller about stopping the allegedly harassing comments.  Indeed, Plaintiff does not seem to allege that he spoke to Defendant Miller at all.  Rather, Plaintiff only alleges that Miller would ask Plaintiff whether he was "here to get [his] H.I.V. injection" in front of "other inmates and staff to the point that everyone thought Plaintiff was H.I.V. positive."  (Compl. 14 ¶ 43.)  These comments do not constitute adverse action.  Although deeply unprofessional, they amount to "'insulting or disrespectful comments' . . . [that] 'without more' are 'simply *de minimis*' acts that fall 'outside the ambit of constitutional protection.'"  *Toliver*, 530 F. App'x at 92 (quoting *Davis*, 320 F.3d at 353); *see also Davis*, 320 F.3d at 353 (holding that the defendants' "'sarcastic' comments" to the plaintiff — "calling him

'stupid,' . . . . [,] speaking to him in a 'hostile' manner, 'burying' his grievances[,] and discussing [the plaintiff's] grievance with another prison official" — "do not, without more, constitute adverse action"); *Lopez*, 136 F. Supp. 3d at 590 ("Although [the] [p]laintiff states that [the] [d]efendants 'publicly humiliated her' and 'caused her mental anguish,' [the] [p]laintiff has not sufficiently alleged that her humiliation or mental anguish rose to the level of psychological pain that was more than de minimis in nature." (alterations and citations omitted); *Vega v. Rell*, No. 09-CV-737, 2011 WL 2471295, at *19 (D. Conn. June 21, 2011) (holding that the plaintiff's allegation that the defendant "began to follow him around and identify him to other correctional officers" not serious enough to support a retaliation claim (citing *Davis*, 320 F.3d at 353)). Because Plaintiff cannot satisfy the second *Davis* factor, the Court concludes that Plaintiff fails to state a retaliation claim against Defendant Miller.[17]

### III.  Conclusion

Therefore, for the reasons stated herein, the Court grants in part and denies in part County Defendants' Motion To Dismiss, and grants in full Medical Defendants' Motion To Dismiss. Plaintiff's claims against Westchester County, Correction Officer Miller, and Medical Defendants are dismissed, as are Plaintiff's claims against Defendant Hewitt in her official capacity.

---

[17] The Court declines to consider at this time whether any Defendant is protected by qualified immunity.  County Defendants' qualified immunity "argument" runs to less than half a page and fails to meaningfully apply the qualified immunity case law to this case.  (*See* County Defs.' Mem. 21.)

The Court also declines at this time to exercise supplemental jurisdiction over the pendent state-law claims alleged in the Complaint.  *See Matican v. City of New York*, 524 F.3d 151, 154–55 (2d Cir. 2008).

Finally, the Court does not read the Complaint to allege any claim relating to Plaintiff's access to WCJ's inmate grievance program.  (*See* Med. Defs.' Mem. 23.)

Plaintiff's claims against Defendant Hewitt in her individual capacity are *not* dismissed and remain live.

Because this is the first adjudication of Plaintiff's claims, the dismissal is without prejudice. Plaintiff is advised that any newly filed complaint will replace, not supplement, the Complaint in this case. Any newly filed complaint must contain all of the claims and factual allegations Plaintiff wishes the Court to consider, as well as all changes to correct the deficiencies identified in this Opinion.

Defendants are ordered to provide the Court with a detailed update as to Plaintiff's medical status, condition, and plan of care within 14 days from the date of this Opinion. No extension will be granted.

The Clerk of the Court is respectfully requested to terminate the pending Motions, (Dkt. Nos. 36, 45), and to mail a copy of this Opinion to Plaintiff.

SO ORDERED.

Dated: December 31, 2018
White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE